United States District Court
Southern District of Texas
**ENTERED**
November 14, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JACK GARCIA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:21-cv-20 |
| | § | |
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT, | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On February 11, 2021, Plaintiff Jack Garcia filed a civil rights complaint against Defendant San Benito Consolidated Independent School District ("SBCISD"). Dkt. No. 1. As the Court reads the complaint, Garcia has raised three claims: (1) SBCISD retaliated against him for his political speech supporting his aunt's campaign for SBCISD trustee; (2) SBCISD retaliated against him because of his political association with his aunt, who was disliked by several members of the board; and (3) SBCISD retaliated against him for filing a grievance, contesting the written disciplinary action against him. Dkt. No. 1, p. 14.

SBCISD has filed a motion for summary judgment, which is currently pending before the Court. Dkt. No. 30. The motion is fully briefed. Dkt. Nos. 35, 36.

After reviewing the record and the relevant case law, it is recommended that the motion for summary judgment be granted. As to the claims regarding political speech and political association, Garcia has failed to show a genuine dispute of material fact that his protected activity was a causal reason for his termination. As to the claim regarding the grievance, Garcia has failed to show a genuine dispute of material fact that he was speaking on a matter of public concern or that his grievance was a cause of his termination.

## I. Background

### A. Factual Background

Garcia was hired by SBCISD in 1999 as a "site coordinator" for Landrum Elementary. Dkt. No. 40-1, pp. 7-8. The site coordinator was responsible for providing

before and after school activities at that site. Id.  In 2003, Garcia was hired as the director of afterschool programming for SBCISD. Id., pp. 9-10.

Around this time, one of the site coordinators started teaching children chess as an after school activity. Dkt. No. 40-1, p. 10.  Other principals wanted the chess component added to their school's after-school activities. Id.  Garcia informed the superintendent that the grant used to fund the after-school programming did not allow for the funds to be used for competition purposes, so if SBCISD wanted to create a competitive chess program, the competition funds would need to be provided by the district. Id.

The SBCISD board of trustees allocated roughly $90,000 each school year for the chess team. Dkt. No. 40-1, p. 17.  Garcia was instructed that the money could be used for travel expenses, instruction, or supplies. Id.  Because the grant money could be used for instruction, Garcia prioritized using the money allocated by the school board for travel expenses for competitive chess tournaments. Id.

**A. Travel Arrangements**

At the beginning, Garcia used a travel agency for procuring the travel arrangements, but discontinued that on the advice of then-CFO Emma McCall, because the travel agency would get a portion of the funds spent. Dkt. No. 40-1, p. 17.  McCall advised Garcia to use Southwest Airlines group sales to save money. Id.  Garcia testified that it was at his "discretion" to find the best method of travel – airplane versus charter bus – and the best companies to use. Id., pp. 17-18.  Garcia would use a credit card supplied by the school district to pay for the travel. Id.  He testified that he would "go pick up a [credit] card directly from the CFO, . . . , and they would give me a card to make bookings and all that, and I would let her know the cost of these trips. That's all I did." Id., p. 18.

When asked about the use of purchase orders, Garcia explained that he would arrange the travel, then submit a purchase order to the SBCISD business office for the final cost of the trip. Dkt. No. 40-1, p. 19.  He stated that most of the airlines and charter bus companies would not accept a purchase order, but required payment via credit card. Id.  Garcia testified that it was impractical to have the purchase order approved prior to the credit card payment because: (1) he was trying to lock in the price of travel; and (2) he

wouldn't know exactly which students would be traveling until a week or so before the tournament, because students had to qualify to compete at certain tournaments. Id.  Garcia testified that he understood the rationale for why it was a best practice to have the purchase order approved prior to money being expended, but also testified that in his 16 years, he never went over budget in his travel expenses. Id., pp. 19-20.  Garcia testified that this process of paying for the travel expenses on the district credit card and then generating a purchase order was only used for travel expenses and that any supplies were purchased from approved vendors in a normal procurement process. Id., pp. 20-21.

On September 8, 2017, Vicki Perez, an accountant with SBCISD, sent Garcia an email about the use of the credit card. Dkt. No. 30-10, p. 49.  Perez stated that, "I understand that your people are coming over to pick up your credit card and you signed an authorization form to pay for their hotel with the credit card.  Please note that the credit card is only for directors when a PO is already in place. Their travel should be paid with a check. I know they just put the PO in right now but in the future, make sure you are allowing enough time to let the PO process accordingly and checks printed." Id.  The record does not contain any replies from Garcia or any indication that Garcia was given further instructions on credit card usage.

### B. 2017 Election & New Superintendent

On May 6, 2017, SBCISD held an election for the Board of Trustees.  ML Garcia[1] – who is Garcia's aunt – was elected to the board, as was Orlando Lopez.[2]  Lopez and Garcia did not run directly against each other; Lopez was elected to the "Place 4" seat while Garcia was elected to the "Place 5" seat.  ML Garcia is a retired teacher, who coached the

---

[1] For the sake of understanding, the Court will refer to Jack Garcia as "Garcia" and will refer to his aunt as ML Garcia in this report and recommendation.

[2] The Court is taking judicial notice of this election under FED. R. EVID. 201(b)(2). See Montana Green Party v. Jacobsen, 17 F.4th 919 (9th Cir. 2021) (taking judicial notice of election results); Jenkins v. Red Clay Consol. School Dist. Bd., 4 F.3d 1103 (3d Cir. 1993) (same).  The election results can be found at https://cameroncountytx.gov/elections/wp-content/uploads/2018/01/San%20Benito%20CISDP.pdf.

chess team for "many years" at Miller Jordan Middle School in San Benito. Dkt. No. 35-11, p. 2.

Garcia – in his affidavit – alleges that he engaged in open political advocacy on behalf of ML Garcia when she ran for school board in 2017. Dkt. No. 35-3, p. 2. He stated that he "attended many of her political functions" and "block-walked neighborhoods, knocking on doors and asking people to vote for her." Id. There is no evidence in the record that any of the other candidates, including Lopez, ever witnessed Garcia campaigning on his aunt's behalf or were otherwise aware of his campaign activities.

ML Garcia, in her affidavit, testified that after the 2017 election, the Board consisted of two factions. Dkt. No. 35-11, p. 1. The majority faction consisted of Lopez, Michael Vargas, Janie Silva, Victor Rosas, and Sonia Weaver. Id. ML Garcia was part of the minority faction; she testified that she was "not aligned" with the majority. Id. Teresa Servellon, who at that time was the director of federal programs for SBCISD, testified that Lopez told her that "I have the majority, so I'm going to get, you know, what I need to get through." Dkt. No. 35-22, p. 4.

In September 2017, the school board hired Nate Carman as the SBCISD superintendent. Dkt. No. 30-4, p. 2. In the three-and-a-half years preceding Carman's appointment, SBCISD had seven "actual, acting or interim" superintendents. Id., p. 3.

In "the fall of 2018," Lopez told Servellon "to stay out of the way because Dr. Carman was going to go after Jack, and that I needed to stay out of the way." Dkt. No. 35-22, p. 5. Servellon testified that Lopez expressed his dislike of Garcia. Id., p. 6. When asked what Lopez stated that he disliked about Garcia, Servellon testified that Lopez "would reference [Garcia's] aunt at times, and then he would reference that some people just didn't like him," apparently referring to members of the community. Id.

### C. Super State Tournament

In January 2019, Garcia was preparing the traveling arrangements for the Super State tournament in Houston, Texas. Dkt. No. 40-1, p. 22. The Super State tournament was considered highly prestigious; Garcia said that if a school wins the Super State "you're pretty much a top dog, as one would say, in the state of Texas in scholastic chess." Id.

Garcia stated that he had "discretion" as to how the chess teams would travel to the Super State tournament in Houston. Dkt. No. 40-1, p. 22. Garcia stated that he had several variables that he was considering, such as: (1) if he waited too long to purchase the travel arrangements, other school districts in Cameron and Hidalgo Counties would purchase their arrangements, driving up his costs as the number of available vendors decreased; (2) making sure his students were put in a position to succeed and would be well-rested before competing; and (3) the additional travel costs with some forms of travel, like needing an extra night in a hotel if the team traveled by charter bus. Dkt. No. 40-1, p. 22.

Garcia stated that around 40 kids were going to the Super State tournament. Dkt. No. 40-1, p. 23. He testified that the top 4 kids from each school qualified for the tournament and that any other students who competed were going on the recommendation of the campus principal. Id., p. 24. It appeared that the top 4 students were the ones whose scores would be used to determine team winners, but the other students were allowed to compete to gain exposure and experience. Id. Garcia testified that he chose to have the team fly to Houston to Super State because "we didn't fit in a bus." Id., p. 23. The cost for the plane tickets, through Southwest Airlines, exceeded $17,000. Dkt. No. 40-1, p. 26.

Around that time, Garcia met with assistant superintendent Hector Madrigal and informed him of the plans to fly to Super State in Houston and the travel plans for the tournament in Chicago. Dkt. No. 40-1, p. 26. Garcia testified that Madrigal "seemed okay with it," only asking if the cost would exceed $50,000. Id. Garcia interpreted the question as Madrigal wanting to know if the expense was going to be so high that it would require pre-approval from the school board. Id., p. 27.

The night before purchasing the tickets, Garcia texted Hilda Rendon, the assistant superintendent for finance, asking about the credit limit on the card. Dkt. No. 40-1, p. 26. Rendon informed Garcia that the card had a $50,000 limit. Id. Knowing that the card had sufficient credit to pay for the purchase, Garcia purchased the nonrefundable tickets. Id

### D. Meeting and Reprimand

That night, Madrigal texted Garcia, asking if he had purchased the tickets. Dkt. No. 40-1, p. 27.  Garcia asked if there was a problem. Id.  Madrigal responded that Dr. Carman wanted to see him at 9 a.m. the following morning. Id.

The meeting was held on February 12, 2019. Dkt. No. 30-10.  Garcia testified that Madrigal, Rendon, and Carman were at the meeting. Dkt. No. 40-1, p. 27.  As Garcia walked in, Carman said, "Mr. Garcia, I've asked Ms. Rendon to see if the -- he can reverse the charges on the credit card. If not, go ahead and tell them that it was an unauthorized purchase." Dkt. No. 40-1, p. 27.  Carman told Garcia that he had not followed the proper procedure in procuring the travel arrangements. Id.  Garcia replied that he purchased the tickets in the same way that he had arranged travel "for the last 16, 17 years." Id.  According to Garcia, Carmen informed him that "we're going to do this differently." Id., pp. 27-28.

According to Garcia, Carmen asked him to reduce the number of chaperones in order to allow the entire traveling party to fit in a 52-passenger bus. Dkt. No. 40-1, p. 28. Garcia argued that he needed all of the chaperones for the safety of the students, given that the tournament would take place in a public hotel where strangers could mingle with the students. Id.  The chaperones were a combination of parents, school district employees and volunteers. Id., p. 30.  When Carmen raised the idea of having the coaches – who were contract employees hired to help the students improve at chess – serve as chaperones, Garcia pointed out that they would need to pay the coaches their contractual hourly rate for their time. Id., pp. 28-30.  Garcia estimated that if the coaches demanded to be paid for every hour of chaperoning over a three-day tournament, it would cost the district $18,000. Id.

On February 13, 2019, Carman issued a written reprimand to Garcia. Dkt. No. 30-10.  The reprimand stated that Carman had determined that bus travel was a much more cost-effective mode of transportation to the Super State tournament and that the number of chaperones could be reduced to a 5:1 ratio of students to chaperones. Id.  Carman wrote that those changes would result in a total cost savings of $16,376.97. Id.  Carman reprimanded Garcia for purchasing the plane tickets without a pre-approved purchase

6

order, in accordance with SBCISD policy. Id.  Carman concluded the reprimand by writing, "Your current actions, as well as a failure to meet these expectations and follow these directives in the future, may be used in determining further action including, but not limited to, suspension or termination." Id., p. 2.

On February 26, 2019, Garcia filed a grievance, protesting his written reprimand. Dkt. No. 35-7.  Garcia claimed that Carman's reprimand was "based on inaccurate information as well as taking my actions out of context." Dkt. No. 35-7.  Garcia sought a retraction of the reprimand and removal of the documents related to the reprimand from his personnel file. Id.

### E. Investigation

On February 21, 2019 – after the reprimand was issued, but before the grievance was filed – SBCISD began an internal investigation of Garcia and how he ran the after school programs. Dkt. No. 30-16.  The investigation uncovered several issues.  It was noted that SBCISD policies required district credit cards to be checked out from the business office and then returned after the charge was incurred, but Garcia checked out his credit card on August 27, 2018, but had never returned it. Id., p. 3.  There were also allegations that Garcia had made a photocopy of the credit card so it could be used even when he did not have the physical card with him. Id., p. 13.

Furthermore, two of Garcia's employees had gone to a lunch at Cheddar's with the English as a Second Language staff and adult students, had their meal paid for; and were marked as working during that time, but their attendance was not required or requested. Id., pp. 9-12.  Another employee was a secretary who Garcia attempted to send – with expenses paid – to a conference in Frisco, Texas, that Carman said had no sessions that were relevant to the clerical staff. Dkt. No. 30-4, p. 13.

It was also alleged that Garcia used his position to benefit ML Garcia, who was paid a stipend to assist the chess teams during her time as a teacher. Dkt. No. 30-4, p. 11. Carman testified at his deposition that they could find no record of any other SBCISD teacher receiving a stipend for coaching chess. Id.  The other allegation was that, when a student would be unable to make an out-of-state tournament, Garcia would allow ML

Garcia to use that student's airline ticket to travel to the tournament instead of cancelling the ticket. Id.

An additional allegation was that Garcia had manipulated a bid process to help a possible family member win the bid. Dkt. No. 30-4, p. 7. Garcia had put out a request for proposals for a grant writer for the after school programs. Id. He forwarded three quotes for consideration to Carman and Madrigal, but one of the applicants stated she was no longer interested and the other was unable to be contacted. Id. The remaining applicant was Laura Cortez, who had previously worked as a grant writer for the after school programs. Id. Carman was concerned that the process may run afoul of SBCISD internal procedures which would require the full board to approve her contract. Id. However, with a major grant deadline looming, Carman felt that he was "left with no choice at that point" and approved Cortez to continue as the grant writer. Id. At the meeting prior to the written reprimand, Madrigal asked Garcia if he was related to Cortez and Garcia denied any familial relationship. Id. Carman testified that he later spoke with Ben Cortez, Laura Cortez's father – who indicated that Laura Cortez was Garcia's second cousin. Id., p. 19. Carman also testified that a review of Garcia's emails showed that he had sought only three bids for the grant writing proposal and that Garcia had emailed Laura Cortez about the opening, leading Carman to believe that the other two bids were sham applicants. Id., pp. 14-15. Ben Cortez testified that he told Lopez – as opposed to Carman – that his daughter and Garcia were cousins. Dkt. No. 35-16, p. 5.[3]

There were also allegations that after Garcia met with Carman, Madrigal, and Rendon on February 12, 2019, that Garcia left the school grounds and met with his aunt at a local business. Dkt. No. 30-4, p. 18. Garcia had stated that he saw his aunt during his

---

[3] Garcia has submitted an affidavit from his mother, Marie Del Rosario Luna Garcia, which states that Garcia and Laura Cortez are "possible fourth or fifth cousins at best." Dkt. No. 35-23. SBCISD has sought to strike this affidavit on the grounds that Garcia never listed his mother as a possible witness. Dkt. No. 36, p. 5. Garcia has argued that the failure to disclose occurred due to clerical error. Dkt. No. 38, p. 3. The Court will not strike the affidavit, but also finds that it would reach the same conclusions in this case regardless of whether the affidavit is considered.

lunchbreak, but it was reported that Garcia saw her at 9 a.m., when he should have been working. Id.

On March 19, 2019, Carman sent Garcia written questions relating to these findings, asking for explanations. Dkt. No. 30-17.  As the use of the credit card, Garcia did not directly deny having a photocopy of the card, but stated that he was "not aware of any policy or rule prohibiting giving school credit information to subordinates to complete delegated purchases." Id., p. 5.

As to the allegation about the employees going to Cheddar's for lunch on work time, Garcia stated that the lunch was for ESL parents as part of their English learning. Dkt. No. 30-17, p. 2.  Garcia stated that the lunch was designed for "the parents to review the menu in English, at the request of the instructor, to engage the students in English, and order their respective meal in English." Id.  His employees went to engage in English language conversation with the parents, with Garcia describing the event as a "working lunch" for his employees. Id.

As to the allegation that he attempted to send his secretary on an expense-paid trip to a conference that was not beneficial for her, Garcia stated that his secretary had many non-secretarial duties relating to a specific grant and her position required a bachelor's degree. Dkt. No. 30-17, p. 1.  Garcia stated that the conference had "plenty of sessions" that related to this employee's non-secretarial duties. Id.  Garcia stated that Madrigal had denied the trip solely because Garcia's secretary had a higher salary than Madrigal's salary, which "agitated" Madrigal. Id.

As to the allegations regarding Laura Cortez, Garcia described her as a "distant relative" and stated that he "was not improperly influenced by this distant relationship." Dkt. No. 30-17, pp. 2-3.  Garcia also stated that he did not remember being asked by Madrigal about any familial relationship with Cortez. Id.

As to the allegation that he met with his aunt during the morning, when he should have been working, Garcia stated that he only saw her briefly during his lunch break and that he did nothing inappropriate. Dkt. No. 30-17, pp. 4-5.

### F. Termination

On March 28, 2019, Carman sent Garcia a letter, notifying him that his employment was terminated, "effective immediately." Dkt. No. 30-21.  Carman stated that he terminated Garcia after reviewing the results of the investigation.  Id.  Carman specifically cited Garcia's "disregard for multiple SBCISD Board Policies and Administrative Procedures, making false statements to your supervisor and to me, inconsistent application of processes within the [after school program], use of District funds to benefit family members, and insubordination have all played a role in this decision." Id.  On that same day, Carman sent an email to the board members, letting them know Garcia had been fired. Dkt. No. 30-22.

On April 15, 2019, Garcia filed a grievance with the school board, contesting his termination. Dkt. No. 30-23, pp. 4-5.  He sought to have the termination reversed. Id.

The school board heard the grievance at its August 2019 meeting. Dkt. No. 35-18. Tony Conners, who was Garcia's lawyer, told the board that the termination was based on false and inaccurate information. Id.  Conners further told the board that these falsehoods "were used to cover up, as well as advance, political retaliation against Jack Garcia because [of] his aunt, Mary Lou Garcia, who was openly critical of the superintendent and the board majority." Id., p. 2.  Conners "specifically told the board in the grievance presentation that the board's failure" to overturn the termination "would constitute ratification of Carman's unconstitutional course of action, and the board would be violating Jack Garcia's First Amendment Freedom of Association rights." Id.[4]  The board did not overturn the decision, which acted as an affirmance of the termination. Id.  ML Garcia abstained from the vote on Garcia's grievance. Dkt. No. 30-25, p. 5.  The remaining five board members who were present voted unanimously to deny the grievance. Id

---

[4] Garcia has submitted into the record a letter which Conners sent to the SBCISD board attorney, outlining why Garcia was challenging Carman's decision and notifying them that upholding the termination would violate Garcia's freedom of association rights. Dkt. No. 35-19.  SBCISD has move to strike the letter because it was not turned over in discovery. Dkt. No. 36, p. 2.  The Court finds that any failure to turn over the letter is harmless because it is largely duplicative of Conners's affidavit, which SBCISD has not sought to strike. Dkt. No. 35-18.  In an abundance of caution, the Court has relied solely on Conners's affidavit and not the associated letter in deciding the motion for summary judgment.

### G. 2020 Election

On November 3, 2020, SBCISD held another election for the Board of Trustees. Garcia ran against Lopez for the "Place 4" seat, while ML Garcia was opposed in her re-election bid for the "Place 5" seat. During the campaign – on October 8, 2020 – Danica Carman, Carman's wife, posted a picture on Facebook, urging voters to re-elect Lopez and another candidate. Dkt. No. 35-4.

During the campaign, a flyer was sent to voters, urging them to vote for Lopez and four other candidates and to reject Garcia, ML Garcia and three other candidates. Dkt. No. 35-5. While the ad is not dated, it does refer to election day as being November 3, which correlates to the 2020 election as opposed to the May 2017 election. The ad references Jack Garcia's termination, stating that he was fired for "breaking board policies and procedures, making false statements, use of District funds to benefit family members, and for unauthorized use of school district credit card." Id.

Another flyer urged voters to "take out the trash" by voting no to "ML and Jack Garcia." Dkt. No. 35-10. The ad specifically referenced Jack Garcia's termination, stating that he was fired for "breaking board policies and administrative procedures;" "making false statements;" using "district funds to benefit family members;" and "insubordination." Id.

Garcia testified that he and his aunt did not run as a slate because "quite frankly, her and I have had difference of opinions." Dkt. No. 40-1, p. 50. Both ML and Jack Garcia lost their school board election bids.[5]

## II. Applicable Law

### A. Summary Judgment

Summary judgment is appropriate when the moving party has established that the pleadings, depositions, answers to interrogatories, admissions, and affidavits – if any – demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

---

[5] The Court takes judicial notice of the election and its results, which can be found at https://cameroncountytx.gov/elections/wp-content/uploads/2020/12/isb-sum.pdf.

A "genuine issue of material fact exists where evidence is such that a reasonable jury could return a verdict for the non-movant." Piazza's Seafood World, L.L.C. v. Odom, 448 F.3d 744, 752 (5th Cir. 2006). The movant "can show there's no material dispute if he demonstrates that the [non-movant] could not prevail even if each factual question were resolved in their favor." Freedom From Religion Found., Inc. v. Mack, 49 F.4th 941, 950 (5th Cir. 2022).

If the non-movant would bear the burden of proof at trial, the moving party may satisfy its summary judgment burden "by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." Ortega Garcia v. U.S., 986 F.3d 513, 533 (5th Cir. 2021). The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. Id.

"All facts must be viewed in the light most favorable to the nonmovant and all justifiable inferences must be drawn in his favor." Crane v. City of Arlington, Texas, 50 F.4th 453, 461 (5th Cir. 2022). Thus, factual controversies are resolved in favor of the non-movant, "but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp., 7 F.4th 315, 321 (5th Cir. 2021). In the "absence of any proof," the Court cannot and will not assume that the non-moving party could or would prove the necessary facts. McCarty v. Hillstone Rest. Grp., Inc., 864 F.3d 354, 358 (5th Cir. 2017).

Finally, "the court should not weigh evidence or make credibility findings" at the summary judgment stage. Seigler v. Wal-Mart Stores Texas, L.L.C., 30 F.4th 472, 476 (5th Cir. 2022). The Court may not choose "which testimony to credit and which to discard" because doing so is a resolution of disputed facts, which the Court may not engage in at the summary judgment stage. Heinsohn v. Carabin & Shaw, P.C., 832 F.3d 224, 245 (5th Cir. 2016).

"In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition." Seigler, 30 F.4th at 477. However, the Court

can ignore an affidavit, under the "sham affidavit doctrine," if it is "inherently inconsistent" with the witness's deposition testimony. Id.  This is because the nonmovant cannot create a genuine issue of material fact by expressly contradicting his own prior testimony. Id.

The sham affidavit doctrine is a "high" hurdle to clear for the movant. Seigler, 30 F.4th at 477.  If the statements in the affidavit and the deposition can be reasonably reconciled, then the sham affidavit doctrine does not apply. Winzer v. Kaufman Cnty., 916 F.3d 464, 473 (5th Cir. 2019).

## B. Section 1983

As relevant here, 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Id.

"Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398, 412 (5th Cir. 2015).  To prevail upon a § 1983 claim a plaintiff must establish two elements: (1) a constitutional violation; and (2) that the defendants were acting under color of state law when they committed the constitutional violation. Whitley v. Hanna, 726 F.3d 631, 638 (5th Cir. 2013).

## C. Political Retaliation

"To establish a First–Amendment, free-speech retaliation claim under § 1983, a public employee must show that (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighed the defendant's interest in promoting workplace efficiency; and

(4) her speech was a substantial or motivating factor in the defendant's adverse employment action." Burnside v. Kaelin, 773 F.3d 624, 626 (5th Cir. 2014).

"[C]ampaigning for a political candidate relates to a matter of public concern." Maldonado v. Rodriguez, 932 F.3d 388, 391 (5th Cir. 2019).

### D. Municipal Liability

A municipality cannot be held liable under § 1983 on a theory of respondeat superior. Monell v. Dep't of Soc. Services, 436 U.S. 658, 691 (1978). Thus, a municipality can be subjected to civil liability if the allegedly illegal conduct is "directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." Robinson v. Hunt Cty., Texas, 921 F.3d 440, 449 (5th Cir. 2019) (quoting Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001)).

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." Piotrowski, 237 F.3d at 578. These elements "are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." Id.

An action taken by a "properly constituted legislative body" can be the basis for municipal liability "because even a single decision by such a body unquestionably constitutes an act of official government policy." Howell v. Town of Ball, 827 F.3d 515, 527 (5th Cir. 2016) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)). An action based on the termination of an employee can be the basis for municipal liability if: (1) the legislative body harbored retaliatory animus against the employee; or (2) the body ratified the recommendation of a supervisor to terminate the employee as well as the supervisor's reasoning – and retaliatory animus – for the termination. Howell, 827 F.3d at 527-28.

## III. Analysis

Garcia has raised three claims of First Amendment retaliation against SBCISD: (1) retaliating against him for his political campaigning on behalf of his aunt in 2017; (2)

retaliating against him for his political association with his aunt; and (3) retaliating against him for filing a grievance in protest of his written discipline. The Court will address each of these in turn.

### A. Campaign

Garcia has alleged that SBCISD retaliated against him for his open political support of his aunt, or alternatively, his lack of support for Lopez. This claim suffers from a fatal flaw: there is no evidence in the record that any decisionmaker was aware of Garcia's political action or inaction.

As previously noted, Garcia must show that: (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighed SBCISD's interest in promoting workplace efficiency; and (4) his speech was a substantial or motivating factor behind the adverse employment action. Burnside, 773 F.3d at 626.

### 1. Adverse Employment Action

As to the first element, the record is clear that Garcia suffered an adverse employment action. Hassen v. Ruston Louisiana Hosp. Co., L.L.C., 932 F.3d 353, 358 (5th Cir. 2019) ("termination is a classic example of adverse employment action under our caselaw").

### 2. Speech on a Matter of Public Concern

As to the second element, Garcia – in his affidavit – alleges that he engaged in open political advocacy on behalf of ML Garcia when she ran for school board in 2017. Dkt. No. 35-3, p. 2. He stated that he "attended many of her political functions" and "block-walked neighborhoods, knocking on doors and asking people to vote for her." Id. These activities constituted speech on a matter of public concern. "[C]ampaigning for a political candidate relates to a matter of public concern." Maldonado v. Rodriguez, 932 F.3d 388, 391 (5th Cir. 2019). SBCISD argues that the Court must disregard this evidence under the "sham affidavit" doctrine.

"In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts

to some degree with an earlier deposition." <u>Seigler v. Wal-Mart Stores Texas, L.L.C.</u>, 30 F.4th 472, 477 (5th Cir. 2022). The Court can, however, ignore an affidavit, under the "sham affidavit doctrine," if it is "inherently inconsistent" with the witness's deposition testimony. <u>Id</u>. This is because the nonmovant cannot create a genuine issue of material fact by expressly contradicting his own prior testimony. <u>Id</u>.

As noted earlier, the sham affidavit doctrine is a "high" hurdle to clear for the movant. <u>Seigler</u>, 30 F.4th at 477. If the statements in the affidavit and the deposition can be reasonably reconciled, then the sham affidavit doctrine does not apply. <u>Winzer v. Kaufman Cnty.</u>, 916 F.3d 464, 473 (5th Cir. 2019).

> In his deposition, Garcia testified as follows:
>
> [Opposing counsel]: Now, let's take it back to at the time [ML Garcia] was on the board, and you were working. Did you actively campaign for her? Did you put -- did you throw a fundraiser for your aunt when she was running?
>
> [Garcia]: No, I didn't throw a fundraiser; but as my aunt, I mean, I supported her.
>
> [Opposing counsel]: Did you -- were you critical of whoever she was running against?
>
> [Garcia]: No, I did not -- I did not -- I did not actively get involved.
> Dkt. No. 40-1, p. 50.

SBCISD argues that the deposition testimony that Garcia "did not get actively involved" is inherently inconsistent with his affidavit that he attended his aunt's political functions, block-walked and generally urged people to vote for her. The Court finds this argument to not be well-taken.

If the testimony can be reconciled, then the Court should not apply the sham affidavit doctrine. <u>Seigler</u>, 30 F.4th at 478. As an initial matter, the question creates a confusing timeline. ML Garcia was first elected in 2017. The question asks Garcia to go back to the time that ML Garcia "was on the board and you were working." This timeline would go from May 2017 – when ML Garcia was first elected – until February 2019, when Garcia was fired. That timeline does not include the time before Garcia was elected. Thus,

the question does not clearly indicate which campaign and which period that Garcia should be testifying to.

Furthermore, "actively involved" is open to a variety of interpretations. Opposing counsel did not follow up on how Garcia viewed being "actively involved." The question was whether Garcia was critical of his aunt's opponent. Garcia could easily view saying "I did not get actively involved" as saying "I did not publicly criticize or impugn her opponent" as much as "I did not engage in any campaign activities on my aunt's behalf." Because his statement that he did not get actively involved is subject to a myriad of interpretations, "the proper course in this case is to allow a jury to evaluate the testimony's credibility." Seigler, 30 F.4th at 478. The Court will not strike the affidavit under the sham affidavit doctrine and finds that Garcia has raised a genuine issue of material fact as to whether he engaged in speech on a matter of public concern.

### 3. Interest in Efficiency

Garcia must show a genuine dispute of material fact as to whether his interest in commenting on matters of public concern outweighed SBCISD's interest in promoting workplace efficiency. The Court finds that he has met this burden. The Court notes that this element is a question of law. Garza v. Escobar, 972 F.3d 721, 728 (5th Cir. 2020).

Because Garcia has shown that his speech involved a matter of public concern – the election of trustees to the local school board – SBCISD must establish that its "interest in promoting the efficiency of the services provided by its employees" outweighs Garza's right to engage in political speech. Garza, 972 F.3d at 729.

"When nonpolicymaking, nonconfidential employees are discharged solely because of their private political views, little, if any weighing of an employee's First Amendment rights against an employer's right to loyal and efficient service is necessary, and the employee's rights will usually prevail." Garza, 972 F.3d at 729 (quoting Gentry v. Lowndes Cnty., Miss., 337 F.3d 481, 486 (5th Cir. 2003)). "While the labels 'policymaker' and 'confidential' are helpful, the ultimate question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." Garza, 972 F.3d at 730 (cleaned up).

SBCISD has not alleged that Garcia was a policymaking employee. Policymakers are "public employees whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors." Garza, 972 F.3d at 729. It is not clear from the record whether Garcia would be considered a policymaking employee, although he routinely testified that he had considerable discretion in how the chess team would travel to tournaments.

But the record is also devoid of any evidence that party affiliation or loyalty to the specific members of the board of trustees is "an appropriate requirement" for the director of afterschool programming. This is not an instance where Garcia works under the direction of a single political official and must implement that official's vision for the office. See Maldonado v. Rodriguez, 932 F.3d 388, 394 (5th Cir. 2019) (noting, for example, that deputy district attorneys must implement the vision that the elected district attorney has promised the voters). In short, "a public employer cannot act against an employee because of the employee's affiliation or support of a rival candidate unless the employee's activities in some way adversely affect the government's ability to provide services." Vojvodich v. Lopez, 48 F.3d 879, 887 (5th Cir. 1995). There is no evidence in the record that Garcia's open support for his aunt's bid for the school board would adversely affect SBCISD's ability to provide after-school services to the community. Garcia has met his burden as to this issue.

### 4. Causation

Garcia must show a genuine dispute of material fact that his political speech was a substantial or motivating factor behind his termination. It is on this ground that he fails.

Garcia does not need to show that his political speech was "the sole factor" for his termination. Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001). Rather, he must show that his speech was "one of the reasons" for his termination. Mooney v. Lafayette Cnty. Sch. Dist., 538 Fed. App'x 447, 454 (5th Cir. 2013). But, most notably, Garcia "must first show that the decision maker was aware of the protected activity." McLaurin v. City

of Jackson Fire Dep't, 217 Fed. App'x 287, 288 (5th Cir. 2006) (citing Manning v. Chevron Chem. Co., 332 F.3d 874, 883 (5th Cir. 2003)).

Once Garcia fulfills this requirement, the burden shifts to SBCISD to show that it would have taken the same action even in the absence of the protected speech. Haverda v. Hays Cnty., 723 F.3d 586, 592 (5th Cir. 2013).  If SBCISD fulfills this requirement, then Garcia has the burden of showing that SBCISD's reasons are pretextual. Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs, 810 F.3d 940, 948 (5th Cir. 2015).  In this case, Garcia has failed to meet the burden, at the first step, of showing causation.  Simply stated, he has not shown that that the decisionmaker was aware of his political speech on his aunt's behalf in 2017.

No matter who the Court considers the decision maker to be in this case, there is no evidence in the record that the decision maker was aware of Garcia's political speech on his aunt's behalf.  Carman was the superintendent who terminated Garcia's employment. Carman was chosen as superintendent in August 2017 and began working in that position in September 2017. Dkt. No. 30-4, p. 2.  Garcia's political speech took place prior to the May 2017 election, several months before Carman took office.  Carman came to SBCISD from Teague ISD, near Waco. Dkt. No. 30-4, p. 2.  In fact, there is no evidence in the record that Carman was aware of Garcia's protected speech, which took place several months before Carman came to San Benito.

Furthermore, Garcia's argument that Carman supported Lopez's faction takes the record out of context.  Carman's wife posted the Facebook photo supporting Lopez in the 2020 school board elections, long after Garcia had been fired.  Additionally, Garcia has produced no evidence showing that Carman agreed with his wife's political beliefs.

Normally, the views and opinions of others would be irrelevant to the analysis of what Carman knew and when he knew it.  However, if Carman was acting at the direction of Lopez, then Lopez's motives become probative. DePree v. Saunders, 588 F.3d 282, 288 (5th Cir. 2009), abrogated on other grounds by Sims v. City of Madisonville, 894 F.3d 632 (5th Cir. 2018)).  Lopez did tell Servellon – several months before Garcia was fired – that she needed to "stay out of the way because Dr. Carman was going to go after Jack." Dkt.

No. 35-22, p. 5.  Lopez indicated to Servellon that he disliked Garcia, referencing his dislike for ML Garcia and also that various community members indicating to Lopez that they didn't like Garcia. Id., p. 6.

What is absent from this testimony is any indication that Lopez was aware that Garcia had engaged in campaign activity on his aunt's behalf.  There is no evidence that Lopez ever mentioned Garcia's 2017 campaign activities or that he was present for any of them. See Reyna v. Garza, 2022 WL 2757579, at *5 (S.D. Tex. July 14, 2022) (the fact that the decisionmaker saw the plaintiff at a political gathering wearing a t-shirt of the decisionmaker's political opponent was sufficient evidence that the decisionmaker was aware of the plaintiff's campaign activities).  Garcia argues that the "Lopez faction, through its PAC, ran specific political fliers and advertisements specifically targeting Jack Garcia and Mary Lou Garcia." Dkt. No. 35, p. 18.  Garcia fails to mention that these fliers and ads were placed in 2020, after Garcia had already been terminated and Garcia was running against Lopez in that election.  There is no evidence that the "Lopez faction" tied Garcia to his aunt during the 2017 election campaign, which is the probative campaign for proving that Garcia was retaliated against.

Without evidence that Lopez was aware of Garcia's political activity, Garcia cannot show causation. McLaurin, 217 Fed. App'x at 288.  The Court cannot speculate or assume that Lopez was aware of Garcia's political activities. See Wells v. Minnesota Life Ins. Co., 885 F.3d 885, 889 (5th Cir. 2018) ("unsupported speculation" will not defeat a motion for summary judgment).

Furthermore, even if the Court considers the Board of Trustees to be the final decisionmaker, there is no evidence that the Board was aware of Garcia's protected political activities on his aunt's behalf.  When Garcia contested his firing to the Board, his attorney argued that the termination was "political retaliation against Jack Garcia because his aunt, Mary Lou Garcia, was openly critical of the superintendent and the board majority." Dkt. No. 35-18, p. 2.  His attorney further argued that the termination would be a violation of Garcia's "First Amendment Freedom of Association rights." Id.  Nowhere did his attorney link the termination to Garcia's protected political speech.  There is no

evidence in the record that any member of the Board of Trustees – other than his aunt, who abstained from the vote – was aware of Garcia's campaign activities on his aunt's behalf in 2017.

Because there is no evidence that any decisionmaker was aware of Garcia's speech, there is no genuine issue of material fact as to causation. Bosque v. Starr Cnty., Tex., 630 Fed. App'x 300, 305 (5th Cir. 2015) ("Obviously, causation requires evidence that the decision-maker have some predicate knowledge of a plaintiff's protected speech") (emphasis added).  As such, SBCISD is entitled to summary judgment as to this claim.[6]

### B. Political Association

"In order to state a claim for retaliation based on the First Amendment right to freedom of association, a plaintiff must show: (1) he suffered an adverse employment action, (2) his interest in 'associating' outweighed the employer's interest in efficiency, and (3) his protected activity was a substantial or motivating factor in the adverse employment action." Caleb v. Grier, 598 Fed. App'x 227, 237 (5th Cir. 2015) (citing Hitt v. Connell, 301 F.3d 240, 246 (5th Cir. 2002)) (cleaned up).[7]

The First Amendment broadly protects two types of association: (1) the choice to enter and maintain certain intimate familial relationships and (2) association for engaging in other activities protected by the First Amendment, such as speech, religion, or redress of grievances. Caleb, 598 Fed. App'x at 237.  In the complaint, Garcia specifies that the defendants retaliated against him for his "political association" with his aunt. Dkt. No. 1,

---

[6] Because Garcia has not shown a genuine dispute of material fact as to causation, the Court need not reach the issue of whether SBCISD would have terminated him even in the absence of the campaign activity or whether Garcia had shown that SBCISD's reasons were pretextual. Gerhart v. Hayes, 217 F.3d 320, 321 (5th Cir. 2000) (noting that the failure to show causation is dispositive).

[7] "Cleaned up" is a parenthetical that signals to the reader that the author "has removed extraneous, non-substantive clutter such as brackets, quotation marks, ellipses, footnote signals, internal citations or made un-bracketed changes to capitalization," in order to make the quotation more readable, but has not altered the substance of the quotation. Na v. Gillespie, 2017 WL 5956773, at *3 (Md. Ct. Spec. App. Dec. 1, 2017); see also Brownback v. King, — U.S. —, 141 S. Ct. 740, 748 (2021) (using "cleaned up").

p. 14.   Thus, the Court will analyze the association claim under the second type of association, for activities that are otherwise protected by the First Amendment.[8]

As previously stated, Garcia has clearly shown a genuine dispute of material fact as to the adverse employment action: he was fired.   The Court will assume, for the sake of argument, that Garcia's interest in being politically associated with his aunt outweighed SBCISD's interest in providing efficient operations.   Nevertheless, Garcia's claim fails on causation grounds.

Garcia must point to evidence showing that the decisionmaker was aware of his political association with ML Garcia. Lindberg v. Bossier Par. Ambulance Serv. Dist., 402 F. App'x 898, 901 (5th Cir. 2010).   There is no evidence in the record that Carman knew of any political support or political association that Garcia had with his aunt.   While Lopez mentioned ML Garcia as a reason that he did not like Jack Garcia, there is no evidence in the record that this animus was based on any political association or activities. Furthermore, there is no evidence that the Board of Trustees was aware of any political association between Garcia and his aunt.   While Garcia's counsel informed the Board of his belief that Carman took his actions as a form of "political retaliation against Jack Garcia" because he was associated with his aunt, he did not cite any facts showing that there was a political motive against Garcia's association with his aunt.   There is no evidence that anyone connected Garcia as a political supporter/associate of his aunt, as opposed to simply being her nephew.

---

[8] Garcia did not raise any claim in the complaint that he was fired simply because he was related to his aunt, which would raise the first type of claim. See, e.g., Kipps v. Caillier, 205 F.3d 203, 206 (5th Cir. 2003) (a claim that a university fired an assistant football coach because his son chose to play for a rival school alleged "an impingement of a cognizable constitutionally protected interest.").   "A claim not raised in the complaint is not properly before the court." Gill v. Petroleum Co-Ordinators, Inc., 2016 WL 4574169, at *4 (W.D. La. Aug. 31, 2016) (citing Fisher v. Metropolitan Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir. 1990)).   The only time that a familial association claim is raised is in passing in response to the motion for summary judgment. Dkt. No. 35, pp. 1, 17.   A claim raised for the first time in response to a motion for summary judgment is not properly before the Court. Cutrera v. Bd. of Supervisors of La. State Univ., 429 F.3d 108, 113 (5th Cir. 2005).   Because the familial association claim was not raised in the complaint, the Court will not address it or analyze it.

Garcia has also argued that he was retaliated against because he was not an open supporter of Lopez and his faction. Dkt. No. 35, p. 16. It is true that "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." Rutan v. Republican Party of Illinois, 497 U.S. 62, 64 (1990). However, there is no evidence that any decisionmaker – whether Carman, Lopez, or the Board as a corporate body – was aware of Garcia's political affiliations (or lack thereof) during the 2017 SBCISD elections.

Because there is no evidence that any decisionmaker was aware of Garcia's political affiliations, Garcia has not shown a genuine dispute of material fact as to causation. As such, summary judgment is appropriate.

### C. Grievance

Garcia has alleged that SBCISD retaliated against him because he filed a grievance against his initial written discipline by Carman. This claim does not survive scrutiny.

As previously established, Garcia must show that "(1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighs the employer's interest in promoting efficiency in the workplace; and (4) his speech motivated the employer's adverse employment action." Gibson v. Kilpatrick, 838 F.3d 476, 481 (5th Cir. 2016). As previously noted, Garcia has shown that he suffered an adverse employment action. What he has not shown is that he was speaking on a matter of public concern. Whether the speech is a matter of public concern is a "question of law that must be resolved by the court." Graziosi v. City of Greenville Miss., 775 F.3d 731, 736 (5th Cir. 2015)

Carman issued a written reprimand to Garcia, which was solely concerning the trip expenses for the Super State tournament and whether Garcia had properly followed procedures and sought the most cost-effective methods of travel. Dkt. No. 30-10. Garcia filed a written grievance, claiming that Carman's reprimand was "based on inaccurate information as well as taking my actions out of context." Dkt. No. 35-7. Garcia sought a retraction of the reprimand and removal of the documents related to the reprimand from

23

his personnel file. Id.  Garcia was not raising any other issues other than what directly related to his employment.

Because Garcia's grievance only concerned how he was carrying out his employment duties, it was not a matter of public concern.  "A petition that involves nothing more than a complaint about a change in the employee's own duties does not relate to a matter of public concern and accordingly may give rise to discipline without imposing any special burden of justification on the government employer." Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 399 (2011) (internal quotation marks omitted).  "Speech that is related only to a superior's employment decisions and that affects a plaintiff in a purely personal manner is not a matter of political, social, or community concern." Gibson v. Kilpatrick, 838 F.3d 476, 484 (5th Cir. 2016) (cleaned up).

In short, Garcia was protesting Carman's written reprimand, believing it to be based on an incorrect and incomplete view of the situation.  It was certainly Garcia's prerogative to challenge Carman's reprimand, but it was not a matter of public concern. See Stotter v. Univ. of Texas at San Antonio, 508 F.3d 812, 827 (5th Cir. 2007) ("Internal personnel disputes and management decisions are rarely a matter of public concern").  Garcia was not raising issues of "malfeasance, corruption or breach of the public trust" by Carman or SBCISD. Graziosi, 775 F.3d at 738 (holding that those issues are matters of public concern).  The Court finds that as a matter of law, Garcia's grievance was an internal personnel dispute and was not speech on a matter of public concern.  As such, SBCISD is entitled to summary judgment.

Furthermore, even if the Court considers the grievance to be a matter of public concern, Garcia's claim still fails because his grievance did not motivate the termination of his employment.  Garcia filed his grievance on February 26, 2019.  On February 21, 2019, SBCISD began the internal investigation, several days before Garcia filed the grievance.  It was the results of that investigation that led to his termination. Dkt. No. 30-21.

While Garcia has disputed the findings of the investigation, the investigation was not caused by Garcia's grievance.  Rather, the investigation preceded the grievance,

precluding any finding that the investigation was retaliation for the grievance. See O'Neal v. Roadway Exp., 181 F. App'x 417, 421 (5th Cir. 2006) ("The record evidence indicates that there was no causation—the discharge could not be in retaliation for the grievance because the decision to discharge [the plaintiff] was made before the grievance was filed."). Accordingly, SBCISD is entitled to summary judgment.

## IV. Recommendation

It is recommended that the motion for summary judgment filed by the San Benito Consolidated Independent School District be granted in full. Dkt. No. 30.  It is further recommended that the Court issue a take-nothing judgment against Plaintiff Jack Garcia.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation in which to file written objections, if any, with the United States District Judge. 28 U.S.C. § 636(b)(1). A party filing objections must specifically identify the factual or legal findings to which objections are being made. The District Judge is not required to consider frivolous, conclusive, or general objections. Battle v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

If any party fails to timely object to any factual or legal findings in this Report and Recommendation, the District Judge is not required to conduct a de novo review of the record before adopting these findings. If the District Judge chooses to adopt such findings without conducting a de novo review of the record, the parties may not attack those findings on appeal, except on the grounds of plain error. Alexander v. Verizon Wireless Servs., L.L.C., 875 F.3d 243, 248 (5th Cir. 2017).

DONE at Brownsville, Texas on November 14, 2022.

_____
Ronald G. Morgan
United States Magistrate Judge